Youssef H. Hammoud (SBN: 321934)
L. Tegan Rodkey (SBN: 275830)
**PRICE LAW GROUP, APC**
6345 Balboa Blvd., Suite 247
Encino, CA 91316
T: (818) 600-5596
F: (818) 600-5496
E: youssef@pricelawgroup.com
E: tegan@pricelawgroup.com
*Attorneys for Plaintiff,*
*Allison Estrada*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

ALLISON ESTRADA,

              Plaintiff,

v.

THE MOORE LAW GROUP, APC;
AND TRANS UNION LLC,

              Defendants.

**Case No.:** 2:22-cv-01594

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

1. **FCRA, 15 U.S.C. § 1681** *et seq.*
2. **FDCPA, 15 U.S.C. § 1692** *et seq.*
3. **RFDCPA, Cal. Civ. Code § 1788** *et seq.*

      Plaintiff Allison Estrada ("Plaintiff"), through counsel, alleges violations of

the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* against Defendant

Trans Union LLC ("Trans Union"). Plaintiff also alleges violations of the Fair Debt

Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* against The Moore

1

Law Group, APC ("Moore Law Group"). Finally, Plaintiff alleges violations of the Rosenthal Fair Debt Collection Practices Act ("RFDCPA"), Cal. Civ. Code § 1788 *et seq.* against Defendant Moore Law Group.

## I.    <u>INTRODUCTION</u>

1.     Plaintiff's Complaint alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* against Defendant Trans Union, for reporting inaccurate information on Plaintiff's consumer reports. "Consumer reports" as defined in 15 U.S.C. § 1681a(d), include both credit file disclosures obtained directly by Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

2.     Plaintiff's Complaint also alleges violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* and Rosenthal Fair Debt Collection Practices Act ("RFDCPA"), Cal. Civ. Code § 1788 *et seq.* against Defendant Moore Law Group, which prohibit debt collectors from engaging in abusive, deceptive, and unfair practices in connection with the collection of consumer debts against Defendant Moore Law Group.

## II.    <u>JURISDICTION AND VENUE</u>

3.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the Fair Credit Reporting Act, a federal law.

*See* 15 U.S.C. § 1681p and 15 U.S.C. § 1692k(d) (permitting actions to enforce liability in an appropriate United States District Court).

4.     Supplemental jurisdiction of this court arises under 28 U.S.C. § 1367 because the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

5.     Venue in the Central District of California is proper pursuant to 28 U.S.C. § 1391 because Defendants regularly transact business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.  Plaintiff also resides in this District.

### III.    PARTIES

6.     Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

7.     Plaintiff is a natural person who resides in Monrovia, Los Angeles County, California.

8.     Plaintiff is a person as defined by Cal. Civ. Code § 1788.2(g) and is obligated or allegedly obligated to pay a debt. Plaintiff is therefore a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c), the FDCPA, 15 U.S.C. § 1692a(3), and Cal. Civ. Code §1785.3(b).

9.     Defendant Moore Law Group is a debt collection law firm. The Moore Law Group's principal place of business is in Santa Ana, CA. The Moore Law Group can be served at 3710 S. Susan St., Suite 210, Santa Ana, CA 92704. The Moore Law Group regularly collects or attempts to collect debts owed or due or asserted to be owed or due another, and therefore is a "debt collector" as defined by 15 U.S.C. § 1692a(6) and Cal. Civ. Code § 1788.2(c). The Moore Law Group also regularly uses the telephone and mail to engage in the business of collecting debts and/or alleged debts from consumers in California.

10.    Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f)). On information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Trans Union regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. § 1681a(f) of the FCRA. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661. Trans Union can be served through its registered agent, Prentice Hall Corporation, located at 801 Adlai Stevenson Drive, Springfield, IL 62703.

4

11.    During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of California and conducted business in the State of California on a routine and systematic basis.

12.    During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

13.    Any violations by Defendants were not in good faith, were knowing, negligent, willful, and intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violations.

## IV.    **FACTUAL BACKGROUND**

14.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

15.    The United States Congress decided that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

16.    Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

17.    The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

18.    The CRA Defendants Experian, Equifax, and Trans Union report consumer information about Plaintiff and other consumers through the sale of consumer reports.

19.    The CRA Defendants' consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

20.    The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendants) to make

lending decisions. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models) to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the CRA Defendants' reports.

21.    FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

22.    The information reported by the CRA Defendants contributes to consumer creditworthiness, including their FICO Scores, which are calculated using information contained in the CRA Defendants' consumer reports.

23.    FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

24.    "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed.

25.    In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist.

26.     The more severe, recent, and frequent late payments are the greater the harm to the FICO Score.

27.     The "amount of debt" a consumer owes also has a major impact on their credit score. When a CRA reports debts not owed by consumers on their consumer reports, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

28.     Lenders also consider a consumer's debt-to-income ration (DTI) before deciding to extend credit or approve financing terms.

29.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

30.     CRA Defendants regularly provide information that allows lenders to calculate the "total amount of debt" a consumer owes based on the total debt reported by the CRA Defendants.

31.     A consumer's income, however, is not included in their consumer report; only their "amount of debt" is.

32.     The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest rates and lower credit limits).

33.     In 2020, the Federal Trade Commission (FTC) received more than 2.1 million fraud reports from consumers.

34.     Consumers reported losing more than $3.3 billion to fraud in 2020, up from $1.8 billion in 2019.

*Allegations Specific to Plaintiff*

35.     On or about March 14, 2020, Plaintiff's wallet and other possession were stolen, along with her credit cards and identification documents.

36.     On or about March 15, 2020, Plaintiff filed a police report with the Monrovia Police Department reporting that her wallet and other belongings were stolen along with her credit cards and identification documents.

37.     Additionally, Plaintiff contacted all the banks and companies for the credit cards that she could remember were in her wallet when it was stolen.

38.     As a result of Plaintiff's quick action, none of the credit cards that she recalled were in her purse had any fraudulent transactions.

39.     Around the same time, Plaintiff's husband lost his job due to the COVID-19 pandemic.

40.     In or around July 2020, Plaintiff began receiving collection calls from Citibank, N.A. ("Citibank") for an alleged debt related to her Citibank credit card.

41.     Plaintiff learned that between June 12, 2020 and July 13, 2020, more than 3 months after her purse had been stolen, her Citibank credit card had been used approximately two hundred (200) times and the balance on her card was $8,267.41.

42.     Plaintiff was shocked as she had not recalled that the card was in her purse and she knew that she had not made or authorized any of the 200 charges.

43.     Plaintiff had not used her Citibank credit card since sometime in or around 2018, and quickly realized her Citibank card was inside her wallet when it was stolen and that she had not contacted Citibank as she did the other banks and companies.

44.     During one of the collection calls from Citibank, Plaintiff explained that the charges were fraudulent, were not authorized by her, that her wallet was stolen in March 2020, that she had made a police report and that Citibank should remove the charges.

45.     On or about July 28, 2020, Plaintiff contacted Citibank to confirm that her dispute regarding the unauthorized charges was received and that an investigation was being conducted. Citibank confirmed that it would investigate the issue.

46.     On August 3, 2020, Plaintiff also added a statement to her Trans Union consumer file that indicated a fraud alert.

47.     On August 25, 2020, Plaintiff amended her police report to include the fact that her Citibank credit card had been stolen along with her other cards and possessions.

48.     She also informed the police department and detectives working on her case of the unauthorized charges to her Citibank credit card.

49.     On September 1, 2020, Citibank responded to Plaintiff's dispute reagrding the unauthorized charges.

50.     Citibank indicated that "[b]ased on our review, we have determined that you are responsible for the charges in question."

51.     Citibank indicated that it's "decision was based, in part, on the following:

   i.   A review of your account shows your card(s) is protected with an embedded chip and was used at a chip enabled car reader. This technology helps ensure your account can only be accessed by the card that was issued by us and not by counterfeit cards. Because the card was in your possession (or if applicable, in the possession of an authorized user on the account), the charges in question are not considered fraudulent activity.

  ii.   The facts and/or information reviewed as part of the investigation does not substantiate the claim of unauthorized use."

52.     Plaintiff was confused, shocked and distraught at Citibank's response because she had clearly indicated to Citibank that her wallet was stolen, which included her Citibank credit card, and that she did not authorize anybody to make those charges.

53.     Clearly, Citibank did not attempt to conduct any type of investigation because the information provided to it by Plaintiff informed them that the thief was in possession of her Citibank card and that would explain how the embedded chip was used.

54.     In or around September 2020, Plaintiff contacted Citibank again in an effort to have them reconsider.

55.     On or about September 16, 2020, Plaintiff emailed Citibank regarding the investigation results. Plaintiff's email stated that she had spoken to Baily Ashley (Citibank Fraud Disputes Investigator) on September 11, 2020, and that her email was regarding her Citibank account ending in 7350.

56.     Plaintiff's email requested that Citibank reopen her case and that Citibank reevaluate the information.

57.     Plaintiff's email provided timesheets to evidence Plaintiff's location between June 5 and July 14 (the time the unauthorized charges were made). Plaintiff included doctors notes and work time sheets to evidence her whereabouts and prove she was not near the location of the unauthorized charges, in addition to statements

12

from her JP Morgan Chase bank account to evidence her regular purchases, and even informed Citibank that it should reach out to her phone company to prove that she was not near the area in which the purchases were made.

58.     Moreover, Plaintiff indicated that Citibank was free to talk with all the detectives familiar with her case and requested that Citibank follow up with the police department again to see that her police report included all the unauthorized charges on her Citibank card. Plaintiff provided the case number associated with her police report at the Monrovia Police Department, and included several numbers for the police department and detectives familiar with her case.

59.     Plaintiff ended the email informing Citibank it was free to contact her and she provided her cell phone number.

60.     On September 21, 2020, Bailey Ashley, a Fraud Disputes Investigator within Citibank Security Operations responded to Plaintiff informing her "[p]er management, I have to investigate this case further to determine re-open eligibility. Once I have all the information from merchants, I will get back to you via phone call."

61.     Plaintiff responded the same day thanking Ms. Ashley for the update.

62.     On October 10, 2020, Plaintiff emailed Citibank via Ms. Ashley for an update because she had not heard back from them.

63.     Despite Plaintiff disputing the charges and working with Citibank to investigate the matter, Citibank continued its collection efforts in an effort to get Plaintiff to make a payment on an alleged debt that did not belong to her.

64.     On or about November 9, 2020, Plaintiff answered a call from Citibank attempting to collect on the fraudulent charges.

65.     Plaintiff explained what happened and that her dispute was being processed, explained to the representative what was going on and requested that Citibank stop making collection calls to her.

66.     On or about November 10, 2020, Citibank responded to Plaintiff's second dispute regarding the unauthorized charges.

67.     Citibank stated the information Plaintiff provided "wasn't enough to support [her] claim and resolve the dispute in [her] favor."

68.     Once again, Citibank refused to remove the charges from Plaintiff's account and stated that Plaintiff was responsible for the charges.

_Inaccurate Reporting on Plaintiff's Consumer Reports and Plaintiff's Dispute_

69.     In or around November 2020, Plaintiff obtained a copy of her consumer credit report from Trans Union.

70.     Plaintiff learned that Defendant Trans Union, and non-parties Experian and Equifax  were inaccurately reporting Plaintiff's CBNA account (the "Account"),

14

account no. starting with 51210652******** with a balance, which was made up of the fraudulent charges.

71. Because Citibank was refusing to correct the problem, Plaintiff decided to reach out to the credit reporting agencies directly to have her consumer credit report reflect accurate information.

72. On November 27, 2020, Plaintiff sent a certified dispute letter to Defendant Trans Union, and non-parties Experian and Equifax.

73. The dispute letters advised the credit reporting agencies that her Citibank card had been stolen and that the charges to her Citibank Account were unauthorized and fraudulent and therefore her Account should be reported with a zero-dollar balance.

74. Plaintiff attached several pieces of documents to the letter, including the police report, timesheets for her whereabouts during the time the unauthorized charges were made, bank statements to reflect her regular purchases, and even suggested that the credit reporting agencies reach out to her phone company to confirm her whereabouts at the time of the unauthorized charges.

75. Moreover, Plaintiff attached information regarding her police report, including the case number and contact information for the police department and detectives that had information on her case.

76.     Upon information and belief, all three credit reporting agencies received Plaintiff's dispute letter.

77.     Upon information and belief, all three credit reporting agencies forwarded Plaintiff's disputes to Citibank.

78.     On or about December 11, 2020, Trans Union sent Plaintiff dispute results. The results indicated that Trans Union deleted the Account from Plaintiff's credit report.

79.     On or about December 16, 2020, Equifax sent Plaintiff dispute results. The results indicated that Equifax deleted the Account from Plaintiff's credit report.

80.     On or about December 29, 2020, Experian sent Plaintiff dispute results. The results indicated that Experian deleted the Account from Plaintiff's credit report.

81.     Sometime thereafter, Plaintiff noticed that Trans Union reinserted the information regarding the Account at issue on her consumer credit report.

82.     Defendant Trans Union did not inform Plaintiff, in writing or otherwise, that it was reinserting the deleted information, i.e., the Account.

83.     Upon information and belief, prior to Trans Union reinserting the deleted information, Citibank did not certify that the information was complete and accurate.

84.     Notably, the other national credit reporting agencies, non-parties Experian and Equifax, did not reinsert the Account.

85.    In or around March 2021, Plaintiff, for a second time, disputed the Account at issue with Trans Union. Plaintiff's dispute explained that she was the victim of identity theft and that the information being reported was inaccurate.

86.    On or about March 30, 2021, Trans Union responded stating that it was refusing to block any information reporting regarding the Account because either the request was made in error, was misrepresented, or Plaintiff had obtained goods, services, or money as result of the transaction at issue.

87.    Defendant Trans Union did not explain to Plaintiff how it made this determination, including what evidence and information it relied upon.

88.    Moreover, Plaintiff was shocked and emotional distraught by Defendant Trans Union's response because the dispute results suggested that she was lying about the identity theft and fraudulent charges.

89.    In an effort to get this matter resolved with Trans Union, Plaintiff believed it might be better to reach out and speak to someone over the phone.

90.    In or around April 2021, Plaintiff called Trans Union and spoke to a representative.

91.    Plaintiff explained to the representative that she was the victim of identity theft, explained that her wallet had been stolen, her Citibank credit card was used to make unauthorized charges, that she had made a police report and was working to get this resolved.

92.    The representative confirmed that Trans Union was in receipt of all the documentation sent previously to support her dispute and that Trans Union would conduct another "reinvestigation."

93.    On or about April 8, 2021, Trans Union sent its dispute results of the phone dispute to Plaintiff stating that the reporting of the Account had been "verified as accurate."

94.    Trans Union re-inserted the inaccurate information about the Account in Plaintiff's credit file.  Trans Union reported the Account as "120 Days Past Due Date" with a balance of $9,487 and a past due balance of $1,652.

95.    Trans Union did not investigate Plaintiff's dispute, and pursuant to its unreasonable procedures, merely forwarded an automated dispute form to Citibank, despite possessing information indicating the charges to the Account were fraudulent and unauthorized.

96.    Had Trans Union conducted a reasonable reinvestigation it would have realized that Plaintiff was indeed the victim of identity theft, her wallet had been stolen, and that she had not authorized any of the charges making up the alleged debt at issue with respect to her Citibank card.

97.    Plaintiff had provided Trans Union with an overwhelming amount of documents in support of this, even including the police report, case number and contact information for the police department and detectives familiar with her case.

98.     Upon information and belief, Defendant Trans Union failed to review any of the documents sent by Plaintiff, failed to reach out to the police department and/or detectives and failed to do any type of investigation.

99.     Rather than perform a reasonable reinvestigation based on Plaintiff's dispute, Trans Union merely parroted information furnished by Citibank.

100.    Upon information and belief, Citibank did not provide Trans Union with any type of evidence to rebut Plaintiff's claim of identity theft.

101.    Upon information and belief, Citibank merely verified that the information it was reporting about Plaintiff was accurate.

102.    Upon information and belief, Trans Union did not require Citibank to provide any type of documentation to evidence why the information it was reporting was accurate, despite Plaintiff putting Trans Union on notice that the information was suspect.

103.    Upon information and belief, Trans Union did not reach out to the police department and/or detectives familiar with Plaintiff's case, nor did Trans Union reach out to any other entity to investigate Plaintiff's dispute.

104.    Trans Union failed, among other things, to review all relevant information regarding the dispute or ignored this information. Consequently, Trans Union continued to furnish inaccurate data despite knowledge of Plaintiff's dispute

and possessing information from which Trans Union should have reported accurate information about the Account.

105.   After receiving the April 8, 2021, dispute results from Trans Union indicating that the Citibank Account was verified as accurate, Plaintiff felt hopeless and believed that there was no way for her to correct her credit report.

106.   Plaintiff was so stressed out by Defendant Trans Union's conduct that she attempted to ignore the situation in an effort to reduce her stress.

107.   Plaintiff felt so hopeless that she stopped communicating with Trans Union about the identity theft and inaccurate reporting, hoping it would just somehow correct itself on its own.

108.   Defendant Trans Union exacerbated an already stressful time for Plaintiff as she was dealing with the COVID-19 pandemic, her husband being without a job, and helping to care for her father who has pancreatic cancer.

109.   Defendant Trans Union's conduct was especially distressing because the other national credit reporting agencies removed the inaccurate information from her consumer credit reports after her first dispute.

110.   However, Plaintiff's attempts to reduce the emotional distress and mental pain and anguish caused by Defendant Trans Union were of no avail.

//

*Citibank and the Moore Law Group's Collection Attempts*

111.    Despite knowing that Plaintiff was the victim of identity theft, Citibank continued its unlawful collection efforts against her.

112.    In addition to placing collection calls to Plaintiff during the time period an investigation was being conducted into the fraudulent and unauthorized charges, Citibank also sent Plaintiff collection letters.

113.    On or about December 16, 2020, Plaintiff received a collection letter from Citibank attempting to collect on the fraudulent charges. The letter informed Plaintiff that her Account was past due, and that Citibank offered payment options such as lower rates and monthly payments. Citibank sent another similar collection letter on January 16, 2021.

114.    On or about November 22, 2021, Plaintiff received a letter from the Moore Law Group stating it had been retained to collect the alleged debt owed to Citibank by Plaintiff.

115.    On or about January 5, 2022, the Moore Law Group filed a lawsuit against Plaintiff in Citibank's name to collect the alleged debt.

116.    The Moore Law Group knew or should have known that the debt they were attempting to collect was incurred fraudulently and without Plaintiff's authorization and therefore, Plaintiff did not owe any money.

117.   Upon information and belief, The Moore Law Group failed to review Plaintiff's account notes prior to attempting to collect on the alleged debt.

118.   Despite having knowledge of Plaintiff's dispute and having sufficient evidence to show the charges were fraudulent, Citibank, along with The Moore Law Group, attempted to collect a debt that was not owed by Plaintiff.

119.   The Moore Law Group's attempts to collect the allege debt were misleading, unfair, unconscionable, and violated numerous provisions of the FDCPA and/or the RFDCPA.

120.   The Moore Law Group's unlawful debt collection practices caused Plaintiff to suffer from emotional distress and mental pain and anguish, including but not limited to, stress, anxiety, headaches, confusion, fear and hopelessness.

### *Plaintiff's Damages*

121.   Upon information and belief, had Trans Union not reported the fraudulent charges on the Account on Plaintiff's consumer reports, Plaintiff's credit scores and/or DTI would have been better.

122.   Trans Union's reporting of an additional $8,000+ of debt which Plaintiff does not actually owe negatively increases Plaintiff's DTI since the debt is substantially greater, but the income in unchanged.

123.   Moreover, Trans Union's reporting of late payments and past due balance for a debt Plaintiff does not actually owe significantly decreases her credit score.

124.   Given the inaccurate reporting of Plaintiff's information, Plaintiff has been chilled from applying for any credit opportunities.

125.   Upon information and belief, the inaccurate information regarding the Account was published to third parties.

126.   In fact, Plaintiff's was so distraught that she had trouble falling asleep, and when did she sleep, she would wake up multiple times in the night thinking about her situation.

127.   In an effort to remedy her sleep problems, Plaintiff purchased over-the-counter sleep pills to help her fall asleep and stay asleep throughout the night.

128.   Plaintiff has continued the use of the over-the-counter sleep pills till the present day.

129.   In addition, due to Defendants' conduct, Plaintiff suffered from frequent and severe headaches.

130.   As a result, Plaintiff began taking over the counter pain killers, such as Tylenol and Motrin, to help alleviate the headaches.

131.   Defendants' conduct caused tension and/or arguments between Plaintiff and her family, including with her spouse and her brother.

132.   Defendants' conduct caused Plaintiff so much emotional distress and mental pain and anguish that she became short-tempered with her family, including her spouse and daughter.

133.   As a direct result of Trans Union's inaccurate reporting, Plaintiff suffers and continues to suffer damages, including a significantly decreased credit score, lower overall creditworthiness, and other financial harm.

134.   Additionally, as a direct result of Defendants actions, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, reputational harm, violation of privacy, humiliation, stress, anger, frustration, shock, hopelessness embarrassment, and anxiety.

## V.   COUNT I
### Defendant Trans Union
**(Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b))**

135.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

136.   The FCRA requires CRAs, like the Trans Union, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

137.   Trans Union negligently and willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of the information it reported about Plaintiff tradelines.

138.   Additionally, Trans Union negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to report accurate information when placed on notice that the information Trans Union is reporting is inaccurate.

139.   Trans Union knew or should have known of its obligations under the FCRA. These obligations are well established by the plain language of the FCRA, promulgated by the Federal Trade Commission, detailed in case law, and evidenced in prior cases involving Trans Union from which it is on notice of its unreasonable procedures concerning the reporting of tradelines after fraudulent charges to an account are made.

140.   Even after Plaintiff notified Trans Union of the inaccurate information on more than one occasion it included in Plaintiff's credit file, Trans Union continued to inaccurately report the fraudulent balance of the Account.

141.   Trans Union failed to follow reasonable procedures, as 15 U.S.C. § 1681e(b) requires, by unreasonably relying on the furnisher's investigation of the dispute and blindly reporting its results despite possessing conflicting information.

142.   When a consumer disputes the accuracy or completion of information included in a CRA's credit file, the FCRA requires the agency to either conduct a

25

reasonable reinvestigation into the disputed information **or** delete the disputed information from the consumer's credit file within thirty (30) days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

143. When conducting its reinvestigation of disputed information in a consumer report, the consumer reporting agency is required to "review and consider all relevant information submitted by the consumer."

144. Additionally, the CRA must notify the person who furnished the disputed information of the consumer's dispute within five business days of its receipt. When notifying the furnisher of the consumer's dispute, the CRA is to "include all relevant information regarding the dispute that the agency received from the consumer." 15 U.S.C. § 1681i(a)(2)(A).

145. Thus, in addition to violating the FCRA by failing to follow reasonable procedures as 15 U.S.C. § 1681e(b) requires, Trans Union violated the FCRA by failing to perform a reasonable reinvestigation of the disputed information even after Plaintiff notified it of its inaccurate reporting of the Account.

146. Defendant Trans Union's violations of 15 U.S.C. § 1681i include, but are not limited to the following:

       i. Failing to reasonably reinvestigate the inaccurate information Plaintiff disputed.

    ii.  Failing to consider all relevant information while investigating Plaintiff's dispute.

    iii.  Failing to include all relevant information when notifying Citibank of Plaintiff's dispute.

147.   In addition, 15 U.S.C. § 1681i(a)(5)(B)(i) states that "If any information is deleted from a consumer's file pursuant to subparagraph (A), the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate."

148.   "If any information that has been deleted from a consumer's file pursuant to subparagraph (A) is reinserted in the file, the consumer reporting agency shall notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion or, if authorized by the consumer for that purpose, by any other means available to the agency." 15 U.S.C. § 1681i(a)(5)(B)(ii).

149.   15 U.S.C. 1681i(a)(5)(B)(iii) states that "As part of, or in addition to, the notice under clause (ii), a consumer reporting agency shall provide to a consumer in writing not later than 5 business days after the date of the reinsertion --

    i.  (I) a statement that the disputed information has been reinserted;

    ii.  (II) the business name and address of any furnisher of information contacted and the telephone number of such furnisher, if reasonably available, or of any furnisher of information that contacted the

consumer reporting agency, in connection with the reinsertion of such information; and

iii.   (III) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the dispute information."

150.   Citibank, the furnisher of the deleted information, did not certify to Trans Union that the information is complete and accurate prior to reinsertion.

151.   Defendant Trans Union did not notify Plaintiff of the reinsertion in writing or otherwise of the reinsertion.

152.   Defendant Trans Union did not provide Plaintiff in writing or otherwise the additional information as stated under 15 U.S.C. 1681i(a)(5)(B)(iii).

153.   Trans Union's acts, as described above, were done willfully and knowingly; or, alternatively, were negligent.

154.   Trans Union's inaccurate reporting damages Plaintiff's creditworthiness.

155.   Plaintiff suffers actual damages, including a significantly decreased credit scope, loss of credit opportunities, and other financial harm caused by Trans Union inaccurately reporting the Account's fraudulent balance on Plaintiff's consumer reports.

156. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

157. Defendant Trans Union's conduct caused Plaintiff loss of sleep, resulting in her use of over-the-counter sleep medication.

158. Defendant Trans Union's conduct caused Plaintiff headaches, resulting in her use of over-the-counter pain killers.

159. Defendant Trans Union's conduct was especially disturbing because ethe other national credit reporting agencies, Experian and Equifax, did not reinsert the inaccurate information or otherwise report it after it was disputed.

160. Trans Union is a direct and proximate cause of Plaintiff's damages.

161. Trans Union is a substantial factor in Plaintiff's damages.

162. Therefore, Trans Union is liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681 *et seq*.

## VI.   COUNT IV
### Defendant The Moore Law Group
### (Violations of the FDCPA, 15 U.S.C. § 1692 *et seq.*)

163. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

164.   The FDCPA is a comprehensive regulatory scheme that Congress enacted to eliminate abusive, deceptive, and unfair debt collection practices by debt collectors and to promote consistent state action to protect consumers against debt collection abuses.  15 U.S.C. §§ 1692(a), (e).

165.   When Congress enacted the FDCPA in 1977, Congress had found that abusive debt collection practices harmed consumers by, among other things, increasing personal bankruptcy, marital instability, loss of employment, and invasion of privacy.

166.   Defendant Moore Law Group violated the FDCPA, 15 U.S.C. §§ 1692e, 1692e(2), 1692e(10) by making false, deceptive, and misleading representations that Plaintiff owed Defendant and Citibank a debt that Defendant knew was fraudulent.

167.   Moore Law Group's representations were made knowingly and with the intent to deceive and mislead Plaintiff and to collect an amount greater than that Plaintiff owed.

168.   Moore Law Group further violated the FDCPA, 15 U.S.C. § 1692f by using unfair or unconscionable means to collect an alleged debt.

169.   Moore Law Group violated 15 U.S.C. § 1692f(1) by attempting to collect an amount that was not owed by Plaintiff and not incurred by Plaintiff.

170.   Moore Law Group filed a lawsuit attempting to collect a debt that it knew or should have known was fraudulently acquired without Plaintiff's authorization.

171.   Moore Law Group's actions were false, deceptive, or misleading means used in connection with the collection of a debt.

172.   As a result of the foregoing violations of the FDCPA, Plaintiff suffered injuries in fact, including but not limited to emotional distress, embarrassment, frustration, lost sleep, stress, anxiety, and interference with usual activities.

173.   Moore Law Group is therefore liable to Plaintiff for actual damages, statutory damages, costs, and attorneys' fees.

174.   The FDCPA is a strict liability statute.

## VII.   COUNT V
### Defendant Moore Law Group
### (Violations of the RFDCPA, Cal. Civ. Code § 1788 *et seq.*)

175.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

176.   Moore Law Group violated the RFDCPA. Moore Law Group's violations include, but are not limited to:

    i.   Collecting or attempting to collect a consumer debt without complying with the provisions of Sections 1692b to 1692j of the FDCPA in violation of Cal. Civ. Code § 1788.17.

ii.     Moore Law Group violated 15 U.S.C. § 1692e by using false, deceptive, or misleading representations or means in connections with the collection of the debt.

iii.     Moore Law Group violated 15 U.S.C. § 1692e(2) by making false representations of the character, amount, or legal status of the debt;

iv.     Moore Law Group violated 15 U.S.C. § 1692e(10), by using false representation or deceptive means to collect or attempt to collect the debt or obtain information concerning the consumer.

v.     Moore Law Group violated 15 U.S.C. § 1692f, by using unfair or unconscionable means to collect or attempt to collect any debt.

## VIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgments against Defendants for the following:

(a)     Declaratory judgment that Trans Union violated the FCRA;

(b)     Declaratory judgment that the Moore Law Group violated the FDCPA and the RFDCPA;

(c)     Actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1), 15 U.S.C. § 1692k(a)(1), and Cal. Civ. Code §1788.30(a);

(d)     Statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1), 15 U.S.C. § 1692k(a)(2), and 15 U.S.C. § 1692k(a)(2);

(e) Punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2);

(f) Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3), § 1681o(a)(2), Cal. Civ. Code §1788.30(c), and 15 U.S.C. § 1692k(a)(3);

(g) Punitive damages to be determined at trial, for the sake of example and punishing Defendant for their malicious conduct, pursuant to Cal. Civ. Code § 3294(a);

(h) Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## IX.  JURY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 9th day of March 2022,

*/s/Youssef H. Hammoud*
Youssef H. Hammoud (SBN: 321934)
**Price Law Group, APC**
6345 Balboa Blvd., Suite 247
Encino, CA 91316
T: (818) 600-5596
F: (818) 600-5496
E: youssef@pricelawgroup.com
*Attorneys for Plaintiff,*
*Allison Estrada*

33